# Richmond

HAROLD R. BRADLEY V. E. JACQUE POOLE.

April 26, 1948.

Record No. 3307.

Present, All the Justices.

The opinion states the case.

*Rixey & Rixey*, for the plaintiff in error.

*Jas. G. Martin & Sons* and *Samuel Goldblatt*, for the defendant in error.

HUDGINS, C. J., delivered the opinion of the court.

This writ of error presents for review the record of a trial that culminated in a verdict and judgment for $50,000 compensation for personal injuries sustained by plaintiff in an automobile accident.

The action involved a collision between an automobile operated by plaintiff and a station wagon operated by defendant. As a result of the accident, which occurred about 1:00 p. m. on March 19, 1946, at the intersection of Colonial and Westover avenues in Norfolk, Virginia, plaintiff's mental and physical powers were seriously and permanently impaired.

While the questions of the negligence of defendant and the contributory negligence of plaintiff were important issues in the case, the amount of compensation to which plaintiff was entitled became the dominant issue as will hereinafter appear.

Defendant's main assignment of error is based upon the refusal of the trial court to sustain his motion to continue the case because of the absence of Dr. Frank H. Redwood, a witness duly summoned by him.

Such motions are addressed to the sound discretion of the trial court, whose decision will not be disturbed unless the record affirmatively shows an abuse of the discretion, to the prejudice of the complaining party. See

cases cited 2 Va. & W. Va. Digest 585, Per. Sup. 301; Burks Pl. & Prac. (3d) chap. 31.

The facts offered to support the motion and the circumstances under which it was made are stated in the following affidavit:

"I, John S. Rixey, being duly sworn, depose and say as follows:

"(1) I am counsel for one of the defendants and am guardian *ad litem* for the other defendant, and have so acted since the institution of this suit, and am so acting now in the defense of this case.

"(2) This action was brought to recover $10,000 damages for personal injury resulting from an accident that occurred on March 19, 1946.

"(3) After the institution of the suit, and before the amendments hereinafter referred to, at my request and employment Dr. Frank H. Redwood, a brain specialist of this city, examined the plaintiff. I attach a copy of the report of Dr. Redwood dated July 5, 1946, marked 'Affidavit Exhibit 1'.

"(4) On August 10, 1946, on motion of the plaintiff, the Court entered an order increasing the amount sued for from $10,000.00 to $50,000.00, over the objection of the defendants.

"(5) The case was set for trial for October 18, 1946. On or about October 3rd, the attorney for the plaintiff asked me to consent to a continuance of the case, assigning as one of his grounds for the request the fact that he wished to get a report from a doctor in Charlottesville, Virginia. I consented to the request for the continuance upon the promise of the attorney for the plaintiff to let me have a copy of the Charlottesville doctor's report. I attach a copy of the report from the Charlottesville doctor, Dr. David C. Wilson, which was furnished to me by the attorney for the plaintiff in fulfillment with his promise, marked 'Affidavit Exhibit 2'.

"(6) Shortly thereafter, the exact date of which I do not recall, the case was set for trial for February 17, 1947.

"(7) Thereafter on December 5, 1946, on motion of the plaintiff, over the objection and exception of the defendants, the Court entered an order again increasing the amount sued for, this time from $50,000.00 to $75,000.00, which latter amount is the amount sued for at the present time.

"(8) Upon the day of the last amendment above referred to, I informed the attorneys for the plaintiff that I would like to have a further medical examination and study of the plaintiff, and it was suggested that after I should talk to Dr. Redwood, I should write a letter to the attorneys setting forth my wishes in that regard. The question of the hospitalization of the plaintiff along the lines stated in my letter of December 17th, hereinafter referred to, was discussed between us. It is my recollection that Mr. Goldblatt stated to me that if I should make the request in writing for such hospitalization and study, he would recommend to the plaintiff that she grant the request, but that he could not guarantee that she would follow his recommendation. Attached are copies of two letters received from Mr. Goldblatt, dated December 6th and December 11th, 1946, marked respectively 'Affidavit Exhibit 3 & 4'.

"(9) Thereafter I had a conference with Dr. Redwood at which we reviewed the situation. Dr. Redwood expressed to me the opinion that he would expect some definite results from the suggested hospitalization, and that he would be willing to undertake the work, provided he could get the cooperation of the plaintiff. At that time I told Dr. Redwood that the case stood set for trial for February 17, 1947. Attached is a copy of my letter dated December 17, 1946, mailed to Mr. Goldblatt, marked 'Affidavit Exhibit 5', the facts stated therein being true.

"(10) Attached is a copy of letter received by me from Mr. Martin, dated December 31st, in reply to mine of December 17th. Mr. Martin's letter is marked 'Affidavit Exhibit 6'.

"(11) On January 16, 1947, at my request, Mr. Martin and Mr. Goldblatt met me in the Chambers of the Court,

for the purpose of my moving the Court to require the plaintiff to submit to further medical examination. At that meeting it was disclosed to me that the plaintiff had that day gone to Charlottesville where she would be hospitalized in the University of Virginia Hospital, under the supervision of Dr. Wilson.

"(12) Attached is copy of my letter to Dr. Redwood dated January 16, 1947, marked 'Affidavit Exhibit 7'.

"(13) Attached is copy of my letter to Dr. Redwood dated January 20, 1947, marked 'Affidavit Exhibit 8'.

"(14) Attached is copy of my reply to Dr. Redwood, marked 'Affidavit Exhibit 9'. The correct date of this letter is not known to me. It was mailed sometime during the week of February 3rd. The reasons that I delayed in answering were (1) that I needed a short time to ascertain that Dr. Redwood's charge would be agreeable to my people and (2) after I ascertained that it was agreeable I was informed by Mr. Goldblatt that he was informed that the plaintiff had returned to the University Hospital for a second period, and was then there. My thought was that Dr. Redwood would be able to get a more complete picture of the plaintiff's condition after the completion of the hospitalization treatment in Charlottesville.

"(15) On February 10, 1947, Dr. Redwood called me on the 'phone and stated that he had made arrangements to leave Norfolk on Saturday, February 15th, for Mexico City, to be gone until April 1st, which I understood was to be a vacation. I told Dr. Redwood that I would promptly lay the facts before the Court, and move that the case be continued, but that in the absence of a continuance I would not be willing to excuse him. I told Dr. Redwood that I was in the hope of using him both as a witness and as an adviser at the trial. Dr. Redwood told me that he thought he could be of assistance to me at the trial.

"(16) That same day in the presence of Mr. Martin I stated the facts to the Court and did move that the case be continued, which motion Mr. Martin resisted. Both Mr. Martin and the Court suggested that I take the deposi-

tions of Dr. Redwood. I told them that I was not willing to take the depositions of Dr. Redwood in lieu of his testimony and expected assistance at the trial for the reasons substantially stated as follows:

"Dr. Redwood is a material witness for the defendants and I think that I cannot properly defend the case without him. He is the only doctor who examined the plaintiff for the defendants. The plaintiff is claiming a serious brain injury. The only doctors who are qualified as specialists in the brain injury field in this section of the State, as far as I know, are Dr Redwood and Dr. Thompson. Dr. Thompson is physician and witness for the plaintiff. The plaintiff has also summoned an eminent specialist, Dr. Wilson, from the University of Virginia. I am informed that the plaintiff will use as witnesses a long list of doctors, but I am not advised as to the extent of their testimony. I think it is probable that I will need Dr. Redwood to testify on rebuttal. I also plead my own ignorance of the medical aspects of brain injury cases and am conscious of the need of the assistance of Dr. Redwood in my efforts at cross-examination of the plaintiff's doctors. The Court overruled my motion for continuance.

"(17) On same day February 10th, after the Court had overruled my motion for continuance, I wrote to Dr. Redwood as per attached copy, marked 'Affidavit Exhibit 10'.

"(18) On February 12th the Court called me on the 'phone and stated that Dr. Redwood was then in his office; and again the Court suggested that I take the depositions of Dr. Redwood. I again told the Court that Dr. Redwood was a material witness for the defendants, and that I thought that I could not do justice to the case if Dr. Redwood were not present at the trial or by the taking of his depositions, and that I would not take his depositions, and that I would not waive my client's rights to the testimony and assistance of Dr. Redwood at the trial.

"(19) I was again in the Chambers of the Court with Mr. Martin in connection with this case on the morning

of February 14th. I asked the Court whether Dr. Redwood would be present for the trial on Monday, February 17th. The Court stated that he understood that he would not be present; that he had told Dr. Redwood that he would take no disciplinary action against him if he did not comply with the subpoena, which I understood to be equivalent to nullification by the Court of the process issued at my instance, and will deprive the defendants of the benefit of the testimony and assistance of Dr. Redwood at the trial. Thereupon I moved the Court to postpone the trial of the case to such time as Dr. Redwood would return from his vacation, which I understood was to be April 1st. The motion was resisted by Mr. Martin on behalf of the plaintiff. The motion was overruled, to which I on behalf of the defendants excepted.

"(20) Summons was properly issued at my instance for the attendance of Dr. Redwood as a witness for the defendants for the trial for February 17, 1947. The subpoena was issued and placed in the hands of the City Sergeant for service on February 10, 1947, and was served on Dr. Redwood on February 12th, and I am informed and believe, was actually received by Dr. Redwood on last mentioned day."

The trial court, on consideration of this affidavit, the material allegations of which are not denied, overruled defendant's motion and assigned the following reasons for its action:

"* * * that the presence of Dr. Redwood at the trial would do defendant no good, and that arrangements with him had not been made, and that he was not a material witness, and that the facts would be shown from a doctor's standpoint by other reputable doctors, including Dr. Thompson, who is associated with Dr. Redwood. And this case had specially been set for trial for February 17, 1947, by request of counsel on both sides more than 60 days before and it would be very difficult to set another date, and plaintiff had summoned witnesses, including several doctors, to be present for the trial on February

17, 1947, one of her doctors to come from the University of Virginia Hospital; and the court being of opinion that defendant's request for continuance was unreasonable, not valid, and intended for delay, the Court overruled defendant's motion for a continuance, and told Dr. Redwood that the Court did not intend to punish him for contempt of court if he was not present at the trial.

"Dr. Redwood's written report is made part of the record."

When a litigant seeks the opinion and aid of an expert in a trial the relationship between the parties is different from that of an ordinary witness summoned to testify to some pertinent fact known to him. In the former case the duty of the witness to attend the trial and give testimony, or otherwise aid the litigant, is created by contract. In the latter case the duty of a witness to attend the trial and testify is a duty created by law and arises out of necessity in the administration of justice. A witness of either class when properly served with subpoena must attend the trial or be subject to punishment for contempt of court.

When Dr. Redwood notified Mr. Rixey of his desire to be absent from Norfolk on the day of the trial Mr. Rixey immediately—that is, on February 10, 1947—moved the court for a continuance on the ground of the expected absence of Dr. Redwood. This motion was overruled. Thereafter, on February 12, 1947, five days before the trial, Dr. Redwood requested the court to excuse him from attending the trial, which request was granted over the objection of Mr. Rixey. The trial court held, in effect, that it was more important for Dr. Redwood to take his vacation than it was for defendant to have the benefit of his expert testimony and aid at the trial, an issue which should have been left to be settled between Mr. Rixey and Dr. Redwood.

Plaintiff was demanding that defendant pay her $75,000. She was prepared to back this demand with the force of the testimony of seven doctors, each of whom

later emphasized some particular phase of her disability. Mr. Rixey did not know at the time he made the motion just what the seven doctors would state. He did know that they were witnesses for plaintiff and that they would testify on every phase of her distressing condition. He was not a brain specialist. He needed the aid of a medical expert to help him analyze the testimony of the experts introduced by plaintiff in order to cross-examine them intelligently. This aid the doctor could have given in addition to giving the jury the benefit of an expert opinion on plaintiff's condition stated from defendant's point of view. Under these circumstances, Mr. Rixey could not state with any degree of accuracy the probable testimony of Dr. Redwood. Indeed, Dr. Redwood, himself, did not know what his expert opinion would be as it depended on the result of his examination of plaintiff and the history of her case as it would be outlined by other doctors. Dr. Redwood's testimony might have been in accord with the views of the other doctors, but he might have stated his opinion in such language as would have tended to reduce the amount of compensation to which the jury believed plaintiff was entitled. Regardless of the value or the weight which the jury might have given the testimony of Dr. Redwood, defendant was entitled to have the jury weigh the expert opinion of the well-known and reliable medical expert employed by him.

While the evidence does not disclose that Mr. Rixey made an express promise to pay Dr. Redwood a specific sum for his opinion and aid in the trial, the statements of Mr. Rixey and the letters of Dr. Redwood to him, clearly reveal that Mr. Rixey engaged him soon after the action was instituted, consulted him from time to time, and had every reason to expect Dr. Redwood's aid and cooperation throughout the trial. Prior to February 10, 1947, Dr. Redwood did or said nothing to lead Mr. Rixey to think that he could not rely upon his testimony and assistance. Notwithstanding these facts, the judge decided that Dr. Redwood was under no contractual obligation to attend

the trial, and over Mr. Rixey's objection, excused him, too late for Mr. Rixey to secure the opinion and aid of another brain specialist in time for the trial. Whether or not there was a valid contract between Dr. Redwood and Mr. Rixey was not an issue properly before the court.

It would have been futile to have taken the deposition of Dr. Redwood as he had not examined the plaintiff since his report which was submitted on July 5, 1946. His testimony would necessarily have been based upon the knowledge he had acquired by previous study and the condition he ascertained plaintiff to be in at the time of the trial.

The facts stated by Mr. Rixey show that he made strenuous efforts before the trial to ascertain the true condition of plaintiff and the extent of her injuries. He agreed in October 1946, to a continuance on the condition that he be furnished with a report of Dr. David C. Wilson, a brain specialist of Charlottesville, who had been employed by plaintiff. Again in December 1946, when plaintiff increased her demand for compensation from $50,000 to $75,000 he sought to have plaintiff hospitalized in one of two hospitals in Norfolk where she could be under the observation of Dr. Redwood. This request was denied, and again in January 1947, Mr. Rixey was in court for the purpose of asking for an order to compel plaintiff to submit to an examination by Dr. Redwood. He refrained from asking for the order on the promise of plaintiff's attorneys to give Dr. Redwood permission to examine plaintiff and inspect her records at the University of Virginia Hospital. This fact was communicated to Dr. Redwood, who, on January 20, 1947, replied, in part, as follows:

"You asked if I can be of any further assistance to you and this is difficult to say because I do not know what her condition is now. I could go to the University of Virginia Hospital and review her records and talk to the doctors but if I could have the report from Dr. Wilson, I might be able to give you just as good an opinion. If I should go there I would charge $200 and would have to have

at least a week's notice because of appointments running so far ahead."

There was some delay in replying to this letter. However, it will be noted that Dr. Redwood stated that if he could examine the report of Dr. Wilson, he might be able to give "just as good an opinion" as he could by making a trip to Charlottesville. Dr. Redwood stated that on February 10, 1947, he received a letter from Mr. Rixey asking him to go to Charlottesville, examine the records, and talk to the doctors about plaintiff's condition. It was upon receipt of this letter that he informed Mr. Rixey and the trial court that he did not expect to be in Norfolk on February 17, 1947.

There is not a scintilla of evidence which tends to support the conclusion that the motion for continuance was made for the purpose of delaying the trial.

The decision of the trial court in granting Dr. Redwood's request to be excused was prejudicial to defendant in that it deprived him of the opportunity to present to the jury the testimony of the only expert witness defendant had engaged and who he had every reason, prior to the action of the court, to believe would cooperate and aid him in the trial.

Plaintiff, a young woman, thirty-seven years of age, who before the accident was strong, healthy, and brilliant, has sustained substantial and permanent injuries. Her mental powers are seriously impaired. The probabilities are that she will be a semi-invalid for life. She is entitled to substantial compensation, but in ascertaining the amount it was, and is, the duty of the trial court to give defendant a fair opportunity to present the views of a medical expert employed by him. This was not done. It therefore becomes our duty to reverse the judgment and set aside the verdict.

The issues of the negligence of defendant and the contributory negligence of plaintiff have been fairly submitted to the jury who has determined these issues in favor of the plaintiff. We therefore remand the case to the trial

court with direction that it determine, in the manner pro-
vided by law, the one issue—the amount of damages to
which plaintiff is entitled.

*Reversed and remanded.*